UNITED STATES of America,
Plaintiff–Appellee,

v.

Shawn Dean CLAYTON, Defendant–
Appellant.

No. 96–10127.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 6, 1996.

Decided March 11, 1997.

Ann C. McClintock, Assistant Federal Public Defender, Sacramento, California, for the defendant-appellant.

Richard Pachter, Assistant United States Attorney, Sacramento, California, for the plaintiff-appellee.

Before: NORRIS and KOZINSKI, Circuit Judges, and MOLLOY, District Judge.[1]

## OPINION

MOLLOY, District Judge.

Defendant Shawn Dean Clayton ("Clayton") cloned phones. He appeals from his conviction and from the sentence imposed by the district court for possession of "cloned" cellular phones, cloning equipment, and unauthorized cellular phone identification numbers, contrary to 18 U.S.C. § 1029(a). We affirm the district court in all respects.

### I.

"Cloning" is the practice of stealing the identification numbers of legitimate cellular phones and programming them into other cellular phones. The "cloned phone" can then be used to make calls that will be charged to the owner of the legitimate phone. To clone a phone, one uses a custom-made cable to connect it to a personal computer. With the aid of specialized software, the computer programs the stolen number into it. The result is a phony phone.

On April 11, 1995, police searched Clayton's pickup truck. They found several cellu-

---

1. The Honorable Donald W. Molloy, United States District Judge, District of Montana, sitting by designation.

lar phones, connecting cables and adapters, a laptop computer containing cloning software, a computer log file containing many unauthorized cellphone ID numbers, and a calendar book with several more unauthorized numbers. The consent search also revealed a small quantity of methamphetamine.

At least two of the phones in the pickup had been cloned. At least twenty-nine of the numbers in the log file had been used to clone phones. Clayton was charged with one count of possessing 15 or more "counterfeit and unauthorized access devices" [meaning the cellphone ID numbers] contrary to 18 U.S.C. § 1029(a)(3), one count of possessing "modified and altered communications devices" [the cloned cellular phones] contrary to 18 U.S.C. § 1029(a)(5), and one count of possessing "hardware and software used for altering and modifying telecommunications instruments" [the cables, computer, and software] contrary to 18 U.S.C. 1029(a)(6). On November 17, 1995, a jury convicted him on all counts.

At sentencing, the district court determined a base offense level of six. The Court increased it five levels based on the amount of monetary loss. It was upped two levels for the degree of planning, and two levels for obstruction of justice. The consequence of the district court's findings was a guideline range of 21–27 months. Clayton was sentenced to 21 months in prison, three years of supervised release, and ordered to pay $10,800 in restitution and a $150 statutory assessment.

## II.

At the close of the government's case, Clayton moved for acquittal. He argued that the government did not produce evidence that his conduct had substantially affected interstate commerce. Additionally, he argued that there was no proof of an intent to defraud with respect to at least 15 of the illicit cellular phone ID numbers found in his possession. Defendant's motions were denied. The trial judge refused Clayton's request to incorporate his rejected theories into the jury instructions. From these rulings, Clayton appeals.

## A.

The denial of a Rule 29 motion for acquittal is reviewed *de novo*. *United States v. Bahena–Cardenas,* 70 F.3d 1071, 1072 (9th Cir.1995). The test applied is the same as the test for challenging the sufficiency of the evidence. *Id.* Consequently, we review the evidence in a light most favorable to the prosecution to determine whether any rational trier of fact could find the essential elements of the offense beyond a reasonable doubt. *United States v. Manarite,* 44 F.3d 1407, 1411 (9th Cir.), *cert denied,* — U.S. ——, 115 S.Ct. 2610, 132 L.Ed.2d 854 (1995). Jury instructions are reviewed *de novo* to see if they accurately state the elements of an offense. *United States v. Tagalicud,* 84 F.3d 1180, 1183 (9th Cir.1996).

18 U.S.C. § 1029(a) contains a jurisdictional element that requires the government to prove Clayton's alleged criminal conduct affected interstate or foreign commerce. Accordingly, each of the counts of the indictment alleged that Clayton's action, from possession to use, affected interstate commerce.

Clayton argues that proof showing a mere "effect" on interstate commerce is legally insufficient to sustain his conviction in light of the Supreme Court's decision in *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). He reads *Lopez* to hold that the jurisdictional element of 18 U.S.C. § 1029(a) requires the government to prove a "substantial effect" on interstate commerce. We find this argument unpersuasive.

In *Lopez*, the Court held that the Gun–Free School Zones Act of 1990 ("GFSZA"), exceeded Congress' authority under the Commerce Clause. That statute made it a federal crime to possess a gun in a school zone. Analyzing its prior interstate commerce cases, the Court identified three broad categories of activity that Congress may regulate under the Commerce Clause: 1) the use of the channels of interstate commerce; 2) the instrumentalities of interstate commerce; and 3) activities that have a substantial effect on interstate commerce. *Id.* at ——, 115 S.Ct. at 1629. Finding that the GFSZA did not fit into the first or second

category, the Court analyzed it under the third category and found the statute unconstitutional because the activity it sought to regulate did not have a substantial effect on interstate commerce. *Id.* at —–——, 115 S.Ct. at 1630–34.

Here, the district court found the statute, unlike GFSZA, regulates the channels or instrumentalities of interstate commerce:

> [A]s to counts two and three, the court finds that the activity does not fall within category three [of *Lopez*]. Thus, as to these counts, the jurisdictional element is satisfied without regard to the "affecting commerce" test developed in *Lopez.*

(Appellant's Excerpts of Record at 49). As for count one, the district court believed cellphone ID numbers were also instrumentalities of interstate commerce. The lower court thought they could conceivably be placed in the third *Lopez* category, *id.;* therefore, in the interests of caution, the court gave Clayton's "substantial effect" instruction on count one. *Id.* at 20–21.

The district court was not wrong in refusing to give a "substantial effect" instruction on counts two and three. Telephones are instrumentalities of interstate commerce. *See, e.g., Pavlak v. Church,* 727 F.2d 1425, 1427 (9th Cir.1984). As such, they fall under category two of *Lopez,* and no further inquiry is necessary to determine that their regulation under 18 U.S.C. § 1029(a) is within the Commerce Clause authority.

The same analysis applies to cellular phone cloning tools and software, that directly affect the use of cellular phones. Moreover, we believe cellphone ID numbers, which are an integral part of the use of cellular phones, are also instrumentalities of interstate commerce. The district court did not err in holding that the government was not required to prove a substantial effect on interstate commerce as an element of the charged offenses.

**B.**

█ Clayton argues that the district court should have granted his motion for acquittal on count one because the government failed to produce evidence showing that the individ

ual possession of each of at least 15 cellphone numbers had a substantial effect on interstate commerce. He also argues the court should have instructed the jury to this effect. These arguments are unpersuasive.

The relevant statutory language makes it illegal to "knowingly and with intent to defraud possess[ ] fifteen or more devices which are counterfeit or unauthorized access devices ... if the offense affects interstate ... commerce...." 18 U.S.C. § 1029(a)(3). Clayton relies on this language in combination with *Lopez* and *United States v. Russell,* 908 F.2d 405 (8th Cir.1990), which held that the government must prove the defendant possessed fifteen access devices at the same time to establish a § 1029(a)(3) violation, and may not aggregate separate possessions to arrive at that total. Clayton contends that *Russell* "addressed indirectly the issue here—the number of access devices required to satisfy the federal crime's elements." Reply brief at 7.

In the government's view, the statute requires only that the combined possession of 15 or more access devices affect interstate commerce. It cites *United States v. Rushdan,* 870 F.2d 1509 (9th Cir.1989), in which the defendant obtained 15 credit card numbers, 6 of which were from out of state, from a federal agent. *Id.* at 1511. We rejected the defendant's argument that the possession of the numbers could not affect interstate commerce because he had no opportunity to use them. *Id.* at 1514. In denying Clayton's motion for acquittal, the district court noted "it appears that the [*Rushdan*] court did not consider whether each individual access device had an effect on interstate commerce, but rather, considered the effect that the possession as a whole had on interstate commerce." Appellant's Excerpts of Record at 50.

█ We agree with the government and the district court. The question is one of statutory interpretation, not jurisdiction, since in setting the 15–device minimum, Congress was concerned not with ensuring Commerce Clause jurisdiction, but rather with a policy of concentrating federal enforcement efforts on larger operators. *See Russell,* 908 F.2d at 407; *Rushdan,* 870 F.2d at 1513. It

would be strange in seeking to focus federal resources on more serious offenders, for Congress to place on prosecutors the cumbersome additional burden of proving an interstate nexus for each of 15 access devices. Moreover, Clayton's reliance on *Russell* is misplaced, since he does not deny possessing 15 or more cellphone numbers at the same time. Clayton's attempt to analogize *Russell* to the issue of an individual effect on interstate commerce is too broad a reading of that case. *Rushdan,* while not directly on point, is more helpful. There, only six of the credit card numbers in question were from out of state. We held that "possession of out of state credit card account numbers is an 'offense affect[ing] interstate or foreign commerce,'" *id.* at 1514, and that it is the entire scheme which, if successful, must affect interstate commerce. *Id.* at 1513. *Rushdan,* 870 F.2d at 1514. We therefore hold that 18 U.S.C. § 1029(a)(3) requires the government to prove only that the aggregate possession of 15 or more unauthorized access devices, affected interstate commerce.[2]

### C.

▇▇▇ Clayton's remaining attacks on the jury instructions are unpersuasive. He was not entitled to an instruction emphasizing that intent to defraud is a necessary element of the offenses, because the given instructions already listed fraud as an element of the offense. *See United States v. Del Muro,* 87 F.3d 1078, 1081 (9th Cir.1996) (rejecting theory-of-the-defense instruction where the instructions given adequately stated the element of intent). Nor did the district court err in giving the Ninth Circuit model jury instruction on reasonable doubt. *United States v. Nelson,* 66 F.3d 1036, 1045 (9th Cir.1995).

### III.

▇▇ The final aspect of Clayton's appeal is his claim that the district court erred in calculating the monetary loss amount it used as the basis for its sentence and restitution order. We disagree.

▇▇ We review findings of fact used in sentencing, including calculations of monetary loss to victims, for clear error. *United States v. Vargas,* 67 F.3d 823, 825 (9th Cir. 1995). The district court must base its findings on a preponderance of the evidence. *United States v. Restrepo,* 946 F.2d 654, 655–57 (9th Cir.1991) (en banc), *cert. denied,* 503 U.S. 961, 112 S.Ct. 1564, 118 L.Ed.2d 211 (1992).

The relevant sentencing guideline is U.S.S.G. § 2F1.1, which includes a table for increasing the offense level based on the amount of monetary loss to victims. Comment 8 to this section states:

> [T]he loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information. This estimate, for example, may be based on the approximate number of victims and an estimate of the average loss to each victim, or on more general factors, such as the nature and duration of the fraud and the revenues generated by similar operations.

U.S.S.G. § 2F1.1, comment 8. Here, the district court arrived at a loss figure of $50,982.21, based on the amount of loss that AirTouch Cellular and AT & T Wireless reported from the 29 cellphone ID numbers found in Clayton's possession. Under § 2F1.1, this fell into the $40,000–$70,000 range which raised the offense level by 5 levels.

Clayton argues that there is no evidence linking him to the entire $50,000 loss because only a fraction of the illicit calls on the victims' bills could be traced to him. He argues that other people could have obtained the same numbers and cloned them. On this basis, he challenges both his sentence of 21 months and the order of restitution, both of which are based on the loss estimate.

We find this argument unpersuasive. The evidence showed that Clayton possessed 29 stolen ID numbers, and that he cloned at least two of them. This supports the district

---

**2.** We likewise reject Clayton's argument that the government must prove an intent to defraud with respect to each device.

court's inference that he was responsible for the loss associated with the remaining stolen numbers found in his possession. We note that the Guidelines do not call for precision, and that the district court could have arrived at similar loss figures using several different methods. For instance, the court could have multiplied 29 numbers times an average loss per victim of $3000 (based on trial testimony) to arrive at a loss of $87,000. Or it could have multiplied 29 times the average street value of $300 per number times an average of 5 sales per number to arrive at $43,500. Each of these figures would have resulted in the same or a higher offense level. We conclude that the district court did not clearly err in calculating the amount of loss associated with Clayton's activities.

### IV.

The convictions and sentence are AFFIRMED.